**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
J&J SPORTS PRODUCTIONS, INC.
        Plaintiff,

    **-** against -

KEVIN DALEY, et al.,
        Defendants.
-----------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
CV 06-0238 (ERK) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

  On January 17, 2006, plaintiff J&J Sports Productions, Inc. ("J&J") filed suit against two defendants: Kev's Barbershop ("Kev's"); and Kevin Daley ("Daley") who is sued "Individually and d/b/a Kev's Barber Shop." *See* Docket Entry ("DE") 1 ("Complaint"), caption. J&J claims that the defendants violated certain provisions of the Federal Communications Act of 1934, as amended ("FCA"). In the absence of any response from the defendant, J&J moved for default judgment on June 14, 2006. DE 6. The Honorable Edward R. Korman, Chief United States District Judge, entered default judgment against both defendants and referred the matter to me for a report and recommendation on damages and costs. DE 8. I now make that report and respectfully recommend that the court vacate judgment as to defendant Daley, dismiss the case against him, and enter an award in favor of the plaintiff against Kev's in the amount of $1,450.00.

I. Background

 A. Facts

  The following recitation is drawn from the uncontested allegations in the Complaint and the evidence that J&J submitted in support of its request for damages, including testimony taken at an inquest on August 15, 2006. J&J owns distribution rights for televised pay-per-view

1

events, and grants licenses to commercial establishments wishing to exhibit such events to their patrons for an undisclosed fee. Complaint ¶¶ 5, 15; DE 6, Plaintiff's Affidavit ("Gagliardi Aff.") ¶ 3. To protect its rights, J&J transmits such events only by closed circuit television or by encrypted satellite signal. Complaint ¶¶ 15-16; Gagliardi Aff. ¶ 3. In addition, J&J employs Signal Auditing, Inc. ("Signal") to seek out unlicensed exhibitions of each pay-per-view event. Gagliardi Aff. ¶ 4. Signal, in turn, hires as investigators independent contractors, who are paid a set amount for each unlicensed exhibition that they discover, and who have the autonomy to conduct their investigations as they see fit. *Id*.

On October 1, 2005, J&J made available to its licensees a program described in the Complaint as "the Tarver/Jones II program (this includes all undercard bouts and the entire television broadcast)" ("the Event"). Complaint ¶ 15. The defendants were not among J&J's licensees. Gagliardi Aff. ¶ 6. On the night of the Event, an investigator for Signal named Thomas Larkin ("Larkin") visited Kev's and observed a television displaying a portion of the broadcast. *See* DE 17 (Transcript of Hearing held on August 15, 2006) ("Tr.") 11. Depending on which of Larkin's various sworn statements is correct, he observed either three, five, or nine individuals in Kev's, which he estimated to have a maximum capacity of 20. *See* DE 18 (Larkin's "Piracy Affidavit"); Tr. 6, 18-19.[1] There is no evidence that Kev's advertised or did anything else

---

[1] Larkin visited Kev's on October 1, 2005. He executed his "Piracy Affidavit" 18 days later, at which time he swore that he saw nine persons present at "Kev's Babber Shop" [sic]. DE 18. At the inquest hearing, he initially testified that he saw "maybe three or five" attendees, Tr. 6, but when I pointed out the discrepancy with his affidavit, he immediately changed his testimony by stating, "There was [sic] nine people." Tr. 18. Larkin tried to explain the malleability of his sworn statements, but I found his testimony in this regard less than convincing. As explained below, however, the precise number of persons in attendance – whether three or nine or something in between – has no bearing on my recommendation as to damages.

2

to solicit business based on its exhibition of the Event. Nor is there any evidence that it did in fact enjoy any greater business than usual as a result of its display of the Event, notwithstanding J&J's speculation that it "most likely led to an increased number of patrons and, thus, an increase in profits" for Kev's and Daley. DE 6, Plaintiff's Memorandum of Law ("Memo.") at 4.

The lack of any advertising, or of anything else that would have publicized the fact that Kev's was displaying the Event begs the question of how Larkin knew to conduct his investigation there in the first place. As it happens, the explanation is as simple as it is troubling: racial and ethnic profiling. As Larkin explained, "If the fighters are Spanish [sic], [or] Afro American [sic], we'll tend to go into places where you have a large population of Hispanic or African-Americans." Tr. 14. Upon further questioning, Larkin agreed that Signal "target[s] [its] enforcement efforts on the ethnicity of the neighborhood" and that he does not go, for example, to an Italian neighborhood to conduct enforcement investigations in connection with a boxing telecast that involves fighters of Hispanic ethnicity. *See id*. Neither J&J nor Larkin offered any explanation for the pernicious assumptions implicit in such an approach – namely, that boxing fans of one ethnicity are unlikely to watch a boxing match involving fighters of another; and that the members of the same ethnic group as a participant in a given boxing match are more likely to commit violations of the FCA. To the contrary, J&J's counsel expressed surprise at this aspect of Larkin's testimony, asserted that J&J "is not targeting any selective neighborhoods" and that the ethnic profiling Larkin described was not the result of "instructions of the plaintiff or any employee of the plaintiff[,]" and allowed that she found the testimony "troubling." Tr. 39.

B.      Procedural History

J&J filed its complaint on January 17, 2006, DE 1, and served it on the defendants three weeks later. DE 3; DE 4. Two months after being served, neither defendant had answered, and J&J accordingly sought a default judgment on June 14, 2006. DE 6. The Clerk entered a Notation of Default on June 26, 2006, DE 7, and Chief Judge Korman granted judgment in J&J's favor and referred the case to me for a recommendation as to the amount of the award. DE 8.

I held an evidentiary hearing on August 15, 2006. I heard Larkin's testimony as well as argument by J&J's counsel about each component of the plaintiff's request for relief, including enhanced damages on the basis of willfulness, and the recovery of costs including reasonable attorney's fees. When I questioned counsel about the evidence supporting the fee request and the extent to which it complied with the requirements described in the case law of this circuit, counsel acknowledged the absence of any contemporaneous billing records and ultimately withdrew her client's request for such reimbursement. *See* Tr. 30-35. In addition, I asked J&J's counsel questions about the extent to which the record sufficed to hold defendant Daley individually liable for Kev's' unlicensed display of the Event, and also about the impact, if any, that Larkin's ethnic profiling – without which this case would arguably never have been brought – might have on the propriety of awarding damages to J&J. Because counsel was not prepared to answer those questions at the inquest, I gave her leave to submit a supplemental memorandum addressing both matters. DE 15. J&J did so three days later. DE 16 ("Supp. Memo.").

II.   Discussion

   A.   Liability

Entry of a default judgment constitutes admission of all well-pleaded allegations, except those pertaining to the amount of damages. *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); Fed. R. Civ. P. 8(d). The court must conduct an inquiry sufficient to establish damages to a "reasonable certainty." *Id*. (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)). The plaintiff bears the burden of proving its entitlement to the amount demanded. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). After reviewing the documentary evidence submitted by J&J, I heard testimony and received exhibits into evidence at the hearing before me on August 15, 2006. DE 6; DE 15.

Two provisions of the FCA prohibit unauthorized reception of cable transmissions. 47 U.S.C. §§ 553, 605(a); *see Time Warner Cable of New York City v. Taco Rapido Rest.*, 988 F. Supp. 107, 110-11 (E.D.N.Y. 1997). The first such provision specifically penalizes any person who "shall intercept or receive or assist in intercepting and receiving any communications service offered over a cable system" absent clear authorization by agreement or law. 47 U.S.C. § 553. The other provision appears at first blush to apply only to unauthorized reception and use of "any interstate or foreign communication by radio[,]" *id*. § 605(a), but the case law is clear that it also applies to cable communications. *International Cablevision, Inc. v. Sykes*, 75 F.3d 123, 132-33 (2d Cir. 1996). A defendant's conduct can simultaneously violate both of these two statutory

5

provisions, but in such circumstances a plaintiff may secure recovery under only one of them. *Id.*; *Taco Rapido*, 988 F. Supp. at 110 (citations omitted).

The facts of this case plainly establish a reasonable basis for liability against Kev's: the business had no license to show the Event to its patrons, and Larkin's testimony demonstrates that it nevertheless did so. However, J&J's attempt to have the individual defendant Daley pay damages raises a more difficult issue, because nothing in the record supports a conclusion that Daley should be held personally responsible for the actions of Kev's. The Complaint sets forth only conclusory allegations based on information and belief to the effect that he is the company's principal, that he supervises and controls its operations, and that he derives financial benefit from the company. Complaint ¶¶ 7-9. The exhibits submitted in support of J&J's motion add no information about Daley's role in Kev's or in the claimed violations of the FCA, and Larkin's testimony likewise added no information that advances J&J's cause. *See* Tr. 21 (Larkin did not know if the proprietor of Kev's was present during the unlicensed display of the Event).

Such generalized allegations cannot suffice to establish vicarious liability for damages under the copyright infringement standard that J&J urges me to apply – a standard that requires a showing of the individual defendant's right and ability to supervise the challenged activity coupled with obvious and direct financial interest. *See Garden City Boxing Club, Inc. v. Morales*, 2005 WL 2476264, at *10 (E.D.N.Y. Oct. 7, 2005). Assuming *arguendo* that such a standard is apposite, it is plainly not satisfied on this record.

Indeed, to the extent that J&J seeks to rest any legal conclusion on the limited information available about Daley, it draws a factual inference the record cannot support: "Daley, as the sole officer, director, shareholder and/or principal of Soul Impressions [sic], had

6

supervisory control over the infringing activities and a financial stake in the business." Supp. Memo. at 4.[2] There is no evidence that Daley had any knowledge that the Event would be exhibited at Kev's, that he had any control over what was being displayed on its television when Larkin visited, or that he derived any benefit from the fact that the Event was displayed. Nor does logic support the inference that Daley as an "officer, director, shareholder and/or principal"of Kev's had the kind of control J&J asserts.[3] The description is disjunctive, and there is nothing in the record to demonstrate which of those various positions, if any, Daley actually held. As a result, there is no basis to assume that Daley enjoyed supervisory control (a shareholder or director might not have such authority), or that he had a financial stake in the business (an officer or director might not have such an interest). In short, there is nothing other than speculation to support the conclusion that Daley played any part in the violations of the FCA committed by Kev's, and even less to support the conclusion that any role he did play would warrant imposing individual liability.

---

[2] I assume that J&J's mention of "Soul Impressions" – the name of the corporate defendant in a similar case now before the court, *J&J Sports Productions, Inc. v. Paris*, docket no. 06-CV-0245 (ERK) (JO), is meant to refer to Kev's. J&J has previously taken the position that a person other than Daley is "the sole officer, director, shareholder and/or principal of Soul Impressions [and has] supervisory control over the infringing activities and a financial stake in the business." *Paris*, DE 16 at 4.

[3] To the extent J&J argument relies on the proposition that Daley was the "sole" person with such a role at Kev's, there is nothing in either the Complaint or the evidence submitted in support of the instant motion that supports it. Moreover, to the extent J&J can demonstrate later – as it has so far failed to do – that Daley is doing business as an apparently unincorporated entity known as Kev's, it will presumably be able to enforce a judgment against defendant Kev's by seeking payment from Daley. On the other hand if, as suggested by J&J's assertion that Daley may be a "shareholder," Kev's is in fact incorporated, then the record is insufficient to pierce the corporate veil and hold Daley individually liable. *See*, *e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) (piercing the corporate veil is a rare exception and applied on a case by case basis in the event of exceptional circumstances or fraud).

I therefore respectfully recommend that the court decline to hold Daley liable in his individual capacity for any damages awarded. The distinction may be of little or no practical import, in which case J&J suffers nothing as a result of my recommendation. But to the extent that J&J has sued two distinct entities and proved the liability of only one, the resulting judgment should reflect that fact – and J&J should in the future take care not to sue individuals without any reasonable basis for so doing.

B. Damages

By displaying the Event without a properly obtained license from J&J, Kev's violated federal prohibitions on unauthorized reception of certain communications. 47 U.S.C. §§ 553, 605(a); *see Sykes*, 75 F.3d at 131; *Entertainment by J&J Inc. v. Mama Zee Rest. & Catering Service., Inc.,* 2002 WL 2022522, at *2 (E.D.N.Y. May 21, 2002). J&J has elected to recover damages under § 605(a) in an amount within the range set by statute.[4] Memo. at 4-5; 47 U.S.C. §§ 605(a), 605(e)(3)(C)(i)(II). Moreover, J&J claims enhanced damages on the strength of its allegation that the Event was displayed in a commercial establishment, asserting that that fact suffices to prove a willful violation and financial gain. Memo. at 5 (citing 47 U.S.C. § 605(e)(3)(C)(ii)). Finally, having withdrawn its application for attorneys' fees, J&J seeks reimbursement of its litigation costs in the amount of $800.00. DE 15. I discuss each component of its request for relief in turn.

---

[4] In its complaint, J&J also sought a permanent injunction, Complaint ¶¶ 37-38, but did not ask for such relief in its application for a default judgment. I therefore conclude that J&J has abandoned its pursuit of injunctive relief.

1. Statutory Damages

Upon finding a violation of the FCA, the court has discretion to award J&J damages anywhere within the statutory range of $1,000 to $10,000. *See* 47 U.S.C. § 605(e)(3)(C)(i)(II); *Mama Zee*, 2002 WL 2022522, at *3. There are at least two methods that courts have employed to choose an award within the range of their discretion. The first method is to multiply the number of individuals who watched the unauthorized broadcast in the defendant's commercial establishment by an amount representing the licensing fee charged to display the telecast in a residence, on the theory that each such individual would have paid to watch the broadcast at home. *See*, *e.g.*, *Garden City Boxing Club, Inc. v. Bello*, 2005 WL 2496062, at *2 (E.D.N.Y. Sept. 20, 2005); *Morales*, 2005 WL 2476264, at*6. Alternatively, the court can award a fixed sum for each violation. *Bello*, 2005 WL 2496062, at *6. Relevant factors include the financial harm suffered by the victim and the burden associated with a monetary award. *Id.* at *3 (quoting *Cablevision Sys. Corp. v. De Palma*, 1989 WL 8165, at *6 (E.D.N.Y. Jan. 17, 1989)).

Larkin claims variously to have seen "maybe three or five" or nine individuals during his three minute investigation at Kev's, and he also had time while there to estimate that the establishment's maximum capacity is twenty people. Tr. 6; DE 18 at 2.[5] According to J&J, its fee for a residential license to view the Event was anywhere from $25.00 to $54.95. Gagliardi Aff. ¶ 10B ($54.95); *see also* DE 20, Declaration of Direct Testimony made by Joseph Gagliardi dated August 10, 2006 ¶ 11B ("between the sum of $25.00 and $50.00"). As a result, the first method of estimating damages would produce an award in the range of $75.00 (multiplying three

---

[5] Describing the duration of Larkin's investigation as three minutes somewhat overstates his work: Larkin testified that part of his investigative method was to use the rest room during a portion of the three minutes he spent at the location. *See* Tr. 19.

attendees by a license fee of $25) to $494.55 (nine attendees multiplied by $54.95). The maximum possible award available under the first method would be $1099.00 (20 attendees multiplied by $54.95). Even the highest of these amounts – based on the counter-factual assumption that Kev's was filled to capacity at the time of the violation – barely exceeds the statutory floor, while the amounts based on Larkin's varying descriptions of the actual attendance fall well short of that minimum. Under these circumstances, the first method of calculating damages is of limited utility, but it does provide some useful guidance in applying the second method.

J&J's counsel conceded at the inquest that J&J has produced no evidence of any actual damages it suffered as a result of the violations here. *See* Tr. 27. I therefore conclude that the most financial harm it could have suffered as a consequence of Kev's display of the Event – the loss of residential license fees from the five attendees (at most) whom Larkin observed – is $494.55. The statutory minimum, $1,000.00, is thus far more than adequate compensation. For a small business, which Kev's appears to be, a damages award in the lower end of the statutory range can be a substantial enough financial burden to deter future violations. *See Kingvision Pay-Per-View, Ltd. v. Olivares*, 2004 WL 744226, at *4 (S.D.N.Y. Apr. 5, 2004); *J&J Sports Productions Inc. v. Gerard J. Louisias, Jr.*, No. CV 06-0339 (ERK) (RER), slip op. at 6 (E.D.N.Y. May 16, 2006).

    2.    <u>Enhanced Damages</u>

The court may enhance its award of damages by an amount up to $100,000 per violation if the plaintiff establishes that the violation "was committed willfully and for purposes of ... commercial advantage or private financial gain[.]" 47 U.S.C. § 605(e)(3)(C)(ii). Willfulness is

defined as "disregard for the governing statute and an indifference for its requirements." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126-27 (1985).

J&J chose not to submit evidence in support of its claimed entitlement to a $100,000 enhancement. Memo. at 5,6; Tr. 27-28. In the absence of any evidence of willfulness, J&J necessarily relies on an appeal to what it believes to be a logical inference – namely, that because Kev's was not on Larkin's list of businesses that had purchased a license to display the Event, and because he saw the Event being displayed there, that someone must have acted willfully. I disagree. It is of course evident that someone did take some affirmative act to enable the television set in Kev's to display the Event, as "[s]ignals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems[,]" *Time Warner Cable of New York City v. Googies Luncheonette, Inc.*, 77 F. Supp.2d 485, 490 (S.D.N.Y. 1999). J&J insists that such an affirmative act is tantamount to willfulness, but in so arguing it is plainly mistaken. An affirmative act can be done in good faith or bad, and the FCA explicitly recognizes that some violations – which necessarily follow an affirmative action to obtain an unauthorized broadcast – may be the result of an innocent mistake. *See* 47 U.S.C. § 605(e)(3)(C)(iii) (providing for an award of damages as low as $250 where "the violator was not aware and had no reason to believe that his acts constituted a violation of" the FCA"); *Louisas*, slip op. at 9-10 & n.7. Indeed, when I pressed her on the subject at the inquest, J&J's counsel acknowledged that a violation of the statute can be the result of accident or honest error, and therefore not willful. Tr. 28. The record before me thus provides no support for a finding that Kev's knowingly disregarded the law.

The record likewise fails to show that Kev's sought financial gain in displaying the Event – indeed, if anything, it suggests the opposite. Larkin saw no advertising, no indication that

11

Kev's charged admission, and no commercial activity on the premises while he was there. DE 18 at 1; Tr. 20-21. Any argument that Kev's acted for pecuniary gain is therefore grounded on nothing more than speculation. I therefore respectfully recommend that the court deny J&J's application for enhanced damages.

      3.    <u>Costs</u>

Litigation costs are available to a prevailing party in an action under the FCA. 47 U.S.C. § 605(e)(3)(B)(iii). J&J seeks $450.00 in court costs and process server fees. Its application in this regard is supported by evidence and thus properly recoverable. DE 6, Attorney's Affidavit of Costs and Fees ("Lonstein Aff.") ¶ 3.

The $350 that J&J seeks as reimbursement for its investigative costs, *id*., is another matter. There is no unanimity on the matter, but I tend to agree with those courts that have concluded that the applicable statutory provision does not allow for the recovery of such costs. *See*, *e.g.*, *J&J Sports Productions, Inc. v. Drake*, 2006 WL 2927163, at *7 (E.D.N.Y. Oct. 11, 2006) (collecting cases). Moreover, the courts that do believe such costs to be recoverable nevertheless recognize that an application to recover them must, like an application for attorney's fees, be supported by contemporaneous records indicating "(1) the amount of time necessary for the investigation; (2) how much the investigators charged per hour; [and] (3) why the investigators are qualified to demand the requested price." *Kingvision Pay-Per-View Ltd. v. Autar*, 426 F. Supp.2d 59, 67-68 (E.D.N.Y. 2006) (alteration in original).

The record here includes no such information supporting reimbursement of Signal's fee. Indeed, it does precisely the opposite: the $350 that J&J seeks as reimbursement of Signal's fee includes two components, neither of which comports with the traditional lodestar methodology.

First, $250 goes to Larkin as a bounty for having discovered a violation. Tr. 16. The amount he received has no relationship to the time he spent investigating (approximately three minutes in this case), and he apparently has no hourly fee, much less one that is justified by evidence of his qualifications. Second, the remaining $100 is simply a mark-up that Signal charges for providing Larkin's services to J&J. *See id*. Thus, the absence of contemporaneous records that would support a request for the reimbursement of Signal's fee is no accident – it accurately reflects the fact that Signal's fee is not a component of litigation costs that J&J can reasonably or lawfully require its adversary to pay. I therefore recommend that the court decline to award such reimbursement.

III. Recommendation

For the reasons set forth above, I respectfully recommend that the court vacate the judgment against Daley, dismiss the case against him, and enter an award in favor of the plaintiff against defendant Kev's in the amount of **$1,450.00**, consisting of $1,000.00 in statutory damages pursuant to 47 U.S.C. § 605(e) and $450.00 in costs.

IV. Objections

The plaintiff is directed to serve a copy of this Report and Recommendation on the defendants by certified mail, and to file proof of service with the court by February 23, 2007. Any objection to this Report and Recommendation must be filed no later than March 12, 2007. Failure to file objections within this period waives the right to appeal the district court's order.

*See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
February 15, 2007

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge